PEOPLE OF PORTO RICO, Plaintiff and Appellee, *v*. FRANCISCO ACEVEDO, Defendant and Appellant.

No. 2581. Argued November 10, 1925.—Decided July 29, 1926.

*Buenaventura Esteves* for the appellant. *José E. Figueras, Fiscal,* for the appellee.

Mr. Justice Hutchison delivered the opinion of the court.

Defendant was convicted of statutory rape and received a sentence of imprisonment in the penitentiary for a term of thirty years at hard labor.

The assignment of errors contains nine specifications. We shall dispose of the more important propositions in a general way without attempting a separate discussion of each point as presented.

Appellant complains of the conduct of the trial judge during the course of the trial and says:

"During the course of the trial the district judge was rather another prosecuting attorney, and, not only did he intervene in order to make clear the doubtful points of the testimony of the witnesses for the prosecution, but also made statements and asked leading questions to strengthen the evidence for the prosecution. Let us quote some of these statements and questions, taking them at random from the record of this case: '*Fiscal:* Was something done to you?—Witness: Yes, sir.—*Fiscal:* What was done to you?—Witness: . . . Judge: Were you dishonored?—Witness: Yes, sir.—Judge: You say that you were dishonored. Who dishonored you?—Witness: Pancho Acevedo, Luis Millán and this other boy.' (See Transcript, p. 10.)

"While Adelis Hernández (a witness for the prosecution and an accomplice in this case) was on the stand the attorney for the defense raised the question as to whether the testimony of said witness could be used in order to corroborate the testimony of the prosecutrix, and the judge said: 'The court is of the opinion that this

is not the testimony of an accomplice, but the testimony of a man who, after the defendant had committed an offense, also commits it himself; that is, he commits the crime of rape; and in case that he did so it is a distinct crime, although perpetrated subsequently.' (See Transcript, p. 21.)

"While Adelis Hernández was still on the stand: 'Judge: After the truck arrived there and that happened with Luis Millán, and what you say happened with Acevedo, you staid in the truck, or went home?—Witness: No, sir, I went home.—Judge: When you went home who remained in the truck?—Witness: Francisco Acevedo.—Judge: And the girl?—Witness: In the front part of the truck.—Judge: She was in the car when you left?—Witness: Yes, sir.—Judge: So that, if anybody had put the bloomers on her, you could not have seen it because you had gone?—Witness: Day was already breaking.—Judge: She had remained in the truck and you left?—Witness: Yes, sir.—Judge: Luis Millán had come before you left, or not?—Witness: Not yet.—Judge: Luis Millán had not yet come from Luis Castro's house?—Witness: Not yet.' (See Transcript, p. 29.)

"And with the same witness: 'Judge: But your testimony is true, it is not a story?—Witness: My testimony is true. How am I going to tell a lie here?—Judge: What you say is not an invention of yours?—Witness: No sir, that is what happened.' (See Transcript, p. 30.)

"While Juana Rodríguez, a witness for the prosecution, was on the stand: 'Judge: Tell me something. You say you were a midwife?—Witness: Yes.—Judge: The midwives in the outlaying districts of the town are godmothers of nearly all the children that they help bring into the world?—Witness: Yes, we at once christen the children in our own way by pouring some water on their heads.—Judge: To do that is not equivalent to a baptism?—Witness: Yes, and if the child dies it may be taken to be buried.—Judge: That is why the midwives are the godmothers of all the children?—Witness: Of all the children that they assist at birth.—Judge: Is that the custom here in Porto Rico?—Witness: Yes, and such godparents are then respected as those who take a child to the church.—Judge: You could not today be married to one of those godchildren?—Witness: That's it.—Judge: You could not marry any of those godchildren?—Witness: Certainly not!' (See Transcript, pp. 44 and 45.)

"While Juan Alicea, witness for the defense, was testifying: 'Judge: Tell me the children that Claudina had, from the first to

the last.—Witness: She had a male child whose name I do not know. —Judge: Rafael?—Witness: I do not know; some of the others are María Asunción, Elisa Salvador, and a little one that she had when I was in school.—Judge: What are the names of the other five?— Witness: I do not know the name of the last one she had.—Judge: Nor do you know the names of the other five? They had ten. Witness: I do not know their names.—Judge: What was the order in which those children were born? On what day was Rafael born?— Witness: I am unable to tell you.—Judge: And María Asunción?— Witness: I think she was born in the month of . . . Judge: And Salvador?—Witness: I do not know.—Judge: And this girl, Elisa? —Witness: I don't know that, either.—Judge: And the other six children?—Witness: I did not know them.' (See Transcript, p. 53.)

"The same witness: 'Judge: What was the age of Elisa when the mother was nursing her?—Witness: About a couple of months.— Judge: Was she already born when the first wife died?—Witness: She was.—Judge: And she was already born when the second wife came back?—Witness: Yes, she was born.—Judge: And do you remember that event?—Witness: Yes, sir.—Judge: Because you saw her before?—Witness: Because I saw her.—Judge: On your way to school, you saw the child nursing at the breast of the mother?—Witness: When doña Adela died we went there to drink some water . . . Judge: There is a difference of three years, more or less, between the death of the first wife and the return of the second, and yet the child was born of the first wife, and when Marrero came with his second wife, after having become a widower and after having married in Spain (that is, after a lapse of three years) you saw her nursing at the breast of the mother, two months after her birth?— Witness: But that was when the wife of don Celedonio died.—Judge: That was not what you said before.—Witness: . . . Judge: So that you saw the child two months after her birth nursing at the breast of the mother when doña Adela died?—Witness: Yes, sir.—Judge: In 1917?—Witness: In 1907, when the lady died.' (See Transcript, p. 54.)

"While witness Adelis Hernández was again on the stand: 'Attorney for the defense: And you said nothing?—Witness: I said nothing.—Attorney: The defendant was the only person who spoke there?—Judge: (interrupting): The witness has testified as to what the defendant said upon being questioned; now, if you think that there is something more . . . Attorney: I have called this witness to contradict the testimony of those two.—Judge: The witness is a

weapon that sometimes is fired toward one side and at other times toward another side, and it often happens that the weapon acts as a boomerang.' (See Transcript, p. 62.)

"When the defendant was called to take the stand: 'Judge: Defendant, I am going to give you this legal information. You have the constitutional right of remaining silent. You are not compelled to speak, but if you want to testify, then you will have to do so with the same truthfulness and certainty as any other witness, and the court warns you that if from your testimony the prosecuting attorney is able to gather some element of proof against you, he is entitled to do it. Now, do you want to testify?—Defendant: Yes, sir.' (See Transcript, p. 63.)

"While the prosecuting attorney was on the stand as a witness for the defense: 'Judge (referring to witness for the prosecution, Adelis Hernández): You did not use him as a witness for the People of Porto Rico, in the technical sense of the word?—Prosecuting attorney: No.—Judge: You did not offer to drop the proceeding against him if he should testify in one way or the other?—Prosecuting attorney: I offered him nothing. I did not see him until the day that he appeared before the grand jury. He had already made a voluntary statement. He had testified voluntarily before the judge advised me to release him.' (See Transcript, p. 66.)''

The right of a district judge to participate in the examination of witnesses, so long as the exercise thereof is kept within reasonable limits of a sound judicial discretion, can not be denied and has been uniformly sustained by this court. In the absence of objection or exception a slight over-indulgence in this regard would not warrant a reversal.

The conduct of the case for the government, however, especially in jury trials, should be left to the district attorney. Otherwise excessive interference by the court, if the general trend of the questions propounded and comments made is favorable to the prosecution, is calculated to prejudice the minds of the jury against the defendant and when considered in connection with other circumstances in the case may lead to the inevitable conclusion on appeal that the accused has not had a fair and impartial trial.

The age of the prosecutrix was not only the most vital

but perhaps the most doubtful question in the case. The principal witness for the prosecution upon this point was the midwife, who by reason of her advanced age had been unable for several years to officiate in that capacity. This woman by associating the birth of the prosecutrix with another case of childbirth said to have occurred at about the same time, the date of which was fixed in turn by an entry in the civil registry, supplied a much needed element of certainty in a most important aspect of the case for the government. Later the defense by a similar method attempted to show that the prosecutrix was over fifteen years of age. For this purpose Juan Alicea was called to the stand. Obviously the conflict between the testimony of the witness last mentioned and that of the midwife was a salient feature if not the dominant factor in the situation. In the circumstances the striking contrast between the consideration shown the one and the aggressive attitude assumed toward the other of these two witnesses by the trial judge in the presence of the jury becomes significant.

The fact that a witness for the defense has proved to be a boomerang in the hands of counsel for the defendant does not ordinarily escape the attention of the jury. If it does the point may be covered by the district attorney in the course of his argument. It does not need the added emphasis of caustic comment from the bench.

Here the accused was already informed of his right to testify for he was about to take the stand. Being represented by competent counsel the defendant was in no apparent need of advice as to the risk involved. The situation in which he was placed was difficult enough without the added embarrassment of a solemn warning as to the nature of the ordeal to which he would be subjected on cross-examination.

The cross-examination itself, however, was not so drastic

as defendant and the jury may have been led to expect. It follows:

"On cross-examination by the prosecution: 'I know Adelis Hernández, he was in the truck, he remained in the truck and I went home with Ernesto Castro and Felipe Rivera; I left her alone because I did not know what she was going to do . . . as she staid there . . . Judge: Do you live near there?—Witness: About a kilometer from don Inés Castro's house.—Judge: You could not furnish shelter to that girl in your home?—Witness: She said nothing to me, she staid there.—*Fiscal:* You left her abandoned there?—Witness: Surely.—*Fiscal:* Did you know where she was going?—Witness: She said she was going . . . from the big rock where we picked her up, she went that far, but she did not say where she was going. —*Fiscal:* You did not ask her where she was going?—Witness: No. —*Fiscal:* What time was it?—Witness: It was about . . . when we reached don Inés Castro's house it was between eleven and eleven-thirty.—Judge: Don Inés lives with his wife?—Witness: Yes, sir.— Judge: It did not occur to you to call don Inés and speak to him about the matter?—Witness: I went home as soon as they gave me the message. I know nothing else'."

The evidence as a whole up to this point was not such as to arouse in the minds of the jury any feeling of sympathy for the defendant. As pointed out by counsel for appellant, the case came on for trial at a time when the cases of Arrocho and Clemente were fresh in the public mind. In the circumstances the better practice would have been to avoid any unnecessary intimation of a duty on the part of defendant to divine what was in the minds of his companions or to anticipate coming . events and to provide shelter and lodging for the prosecutrix. *People* v. *Ruiz*, 34 P.R.R. 505.

Eight special instructions were requested by defendant and refused by the district judge upon the ground that they had been included in the general charge. We transcribe the first seven of these proposed special instructions:

"1. That in a crime of technical rape, as the present one, it is necessary to show, beyond a reasonable doubt, the age of the alleged victim.

"2. That if the jury are in doubt as to the age of the prosecutrix, the defendant should be acquitted.

"3. That if the age of the prosecutrix is not satisfactorily established, the jury should acquit the defendant.

"4. That, in order to connect the defendant with the commission of the crime, the testimony of the prosecutrix should be corroborated in its essential points; the testimony of the physician as to the defloration not being sufficient corroboration.

"5. That according to section 253 of the Code of Criminal Procedure a conviction can not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself and without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof.

"6. That the jury is the sole judge in determining whether or not the witness is an accomplice.

"7. That in these cases the witness acts under a promise of immunity; and that, although it is true that this promise is always denied by the accomplice, its existence is always suspected."

The instructions given in so far as pertinent to the question here involved are set forth in the Spanish text of this opinion, 35 D.P.R. 966, 973–976.

Luis Acevedo, Luis Millán, Francisco Acevedo and Adelis Hernández on the night in question were traveling in a truck belonging to Ernesto Castro, their destination being the house of Ernesto's father. The prosecutrix was picked up on the road shortly before midnight and transported to the spot where the truck stopped near the dwelling of Inés Castro. She rode on the front seat between Luis Acevedo, who was in charge of the truck, and Luis Millán, the driver. Francisco Acevedo and Adelis Hernández were in the body of the car.

The prosecutrix says that when the truck stopped Luis Acevedo went away and that she was raped by Luis Millán, Francisco Acevedo and Adelis Hernández in the order named. She also says that Millán disappeared after having committed the offense, but that appellant and Hernández

slept in the body of the truck. She seems to have spent the night on the seat in the cab and insists that she saw Hernández and defendant asleep when she awoke in the morning.

Ernesto Castro says that he met the car when it arrived at his father's dwelling and that he accompanied Francisco Acevedo to his home; that Luis Acevedo went immediately to bed in Inés Castro's house and that Millán who lived there followed him; that Adelis Hernández was left in charge of the truck; that Hernández and the prosecutrix remained with the truck.

Another witness claims to have accompanied Castro and defendant to the latter's home. Defendant also says that Hernández remained with the truck when defendant departed in company with his brother-in-law and Castro. Hernández himself testifies that he followed Millán and the prosecutrix to a point where they turned into a by-way and that he remained for about an hour as an eye-witness to what occurred near the roadside; that after returning to the truck he spent some three-quarters of an hour in observing the conduct and acts imputed by him to defendant.

Both Pérez, the night-watchman, and Quiles, the barber, testified that Hernández on the following morning cheerfully proclaimed his own act of sexual intercourse with the prosecutrix.

From the testimony given by the district attorney when put upon the stand by defendant we quote the following:

"Attorney: Who were the persons accused of this crime?—*Fiscal:* I am going to explain. The Municipal Judge of Lares called me up and told me of an awful crime that had been committed, which is the one that is being investigated in this court; that there were three persons accused, and he explained the case to me. He then told me that one of them was a very young sick boy, who had already testified, and that he thought that the evidence against that boy was weak; that the boy's testimony was good and in view of the fact that the boy was delicate (in the judge's belief he was a consumptive) he asked me what I thought of the case. I then ad-

vised him to investigate whether or not the age of the boy was more than sixteen years, because you know that if it was less than sixteen years he could not be prosecuted but would have to be sent to the Reform School. The municipal judge told me that he thought that the boy was not sixteen years of age, that the evidence against him was weak, and that his testimony was good, being corroborated in all its points. And then I told the judge that, this being the case, he could release this boy and increase the amount of the bond for the other two defendants. Later you came to my office, informed me that you represented them, talked and argued with me, and I then lowered the amount of the bond at your request.—Attorney: But the fact is that you fixed a bond of three thousand dollars for each defendant?—Witness: Not for the boy I think; I am not sure. —Attorney: Please consult the record.—Witness: This is the record wherein the order of arrest issued by the municipal judge appears. —Attorney: Against whom?—Witness: Against the three, the amount of $1,500 being fixed for each one; later I took the case and increased the bond of these two defendants, this one whom you are now defending and Luis Millán.—Attorney: And the other defendant?—Witness: I think that I did not increase the bond of the other defendant. What is more, I think that in accordance with the communication of the judge, I told him to release the boy."

It is not our purpose at this time to show that Hernández was an accomplice. If there was any evidence upon which to base a finding in this regard the question was one for the jury. The jury therefore should have been told that they were to decide whether or not Hernández was an accomplice; and if he were an accomplice whether or not his testimony had been corroborated. It was incumbent upon the court of course to explain the meaning of the word "accomplice" as used in the statute requiring corroboration of accomplice testimony, to indicate the kind of corroboration required and to point out what might be regarded as such corroboration in case the jury should believe the witnesses who testified in regard to the matters so pointed out.

We have no quarrel with the proposition that "Persons who, without concert of action, commit similar crimes at

the same time, are not accomplices of each other." 16 C. J. 676.

We quite agree with the court below that the rape of prosecutrix by Hernández immediately after the commission of a like offense by Acevedo would not, without more, make Hernández an accomplice. But the premise involved not only ignores all the other facts and circumstances in the case but also assumes as a fact a previous act of sexual intercourse on the part of Acevedo. Unless either Millán or Acevedo had committed the crime of rape, Hernández could not have committed "another" crime but was guilty of the offense with which defendant was charged, and defendant would become a mere accessory before the fact at most in reality although technically and by statute a joint principal. The question, therefore, as to whether or not Hernández had committed another crime without having participated in any way in the offense with which defendant was charged being a prime factor in the question of complicity *vel non*, was as much a question for the jury as was the question of complicity itself.

In the absence of any adequate definition of the term "accomplice" or of any explanation of the rule requiring corroboration of accomplice testimony, the instructions as given left the jury to infer that proof of simultaneous penetration by two or more joint principals is necessary to show complicity in rape. Nor does our statute require proof of an offer of immunity from prosecution although the hope or expectation of such immunity is of course in theory the basis of the statutory rule. Moreover, in the instant case, aside from the statement of Hernández himself to the effect that the municipal judge offered him no inducement to become a witness for the prosecution, there is nothing whatever to show the nature or number of interviews had by Hernández with the warden, the police and the municipal judge. Hernández himself says that he spent five days in jail and made his statement in order to obtain his own free-

dom after his companions had been released on bail. Thereupon the municipal judge in reporting the matter to the district attorney called the attention of that officer to the tender years and the consumptive appearance of the prisoner and pointed out that he had made a good statement. Then the district attorney told the municipal judge to set the captive free.

The one uncontroverted fact in the case at the time the instructions were given was that Elisa Vélez had lost her virginity. Conceding for the sake of argument that the prosecutrix was shown to be under age, then the *corpus delicti* was also established. There was testimony tending to show that Luis Acevedo and Millán immediately upon arrival at the house of Inés Castro went into the house and to bed and that defendant also departed leaving Hernández in the road or in the truck with the prosecutrix. There is testimony tending to show that on the following morning Hernández admitted having had sexual intercourse with the prosecutrix during the night. If this testimony be true, Hernández did not commit another offense but was guilty of the crime imputed by him to defendant. If the name of Hernández had been substituted for that of Acevedo in the indictment, Hernández, upon the theory that but a single crime had been committed, might have been convicted of the offense with which defendant was charged, and this conviction might have been obtained upon, and sustained by, the evidence adduced at the trial herein, with or without the statement of Hernández. The court had no right to exclude from the consideration of the jury the theory of a single offense and arbitrarily to substitute therefor the hypothesis of a double or triple crime as the sole and exclusive basis of their deliberation.

Upon the theory of a double offense it was for the jury to determine whether or not there was any concert of action. It was for the jury to decide whether Herández was a mere spectator, an innocent bystander, or whether he was

standing guard while loitering about the roadside and truck for some two hours or more, or whether in any other way, while awaiting his own opportunity, he aided, abetted or encouraged the acts imputed by him to defendant. And for the purpose of arriving at a conclusion in this regard the jury should have been left free to consider all the facts and circumstances in the case, including the rape of prosecutrix by Hernández if the jury believed Hernández to be guilty of such separate and subsequent offense.

Our statute likewise forbids the conviction of any man under indictment for rape upon the uncorroborated testimony of the prosecutrix. Thus the rule requiring corroboration of accomplice testimony has been extended in this jurisdiction to include the testimony of the prosecuting witness in this as well as in other specified sexual crimes. We have no sympathy with these legislative enactments. Subdivision 8 of section 233 of the Code of Criminal Procedure, as amended in 1911, Comp. Stats. sec. 6265, properly understood and put into practice by the district courts, would afford ample protection to the accused in cases of this kind and would at the same time secure the conviction of the guilty in many such cases which do not come within the reason of the rule requiring corroboration. But the propriety of abrogating or modifying the inflexible and unqualified requirement as to corroboration in the cases enumerated in the Code of Criminal Procedure is a question for the consideration of the Legislature rather than that of the courts. So long as these laws remain upon our statute books they must be respected and, when invoked by a defendant, enforced.

In the instant case the jury were told in so many words that the determination of but two questions was necessary, first, whether or not the crime of rape had been committed upon the person of the prosecutrix; and second, whether or not the prosecutrix was under the age of fourteen years. It was conceded that corroboration as to the *corpus de-*

*licti* was required, but no clear indication can be found to the effect that the testimony of the prosecutrix must be corroborated by other evidence tending to connect the defendant with the commission of the crime. There is, of course, no lack of such evidence. But the jury was at liberty to believe or not to believe the witnesses whose testimony corroborated that of the prosecutrix in so far as the same tended to identify defendant as the criminal. Even though the testimony of the night watchman as to the admissions made by defendant, and that of the alleged accomplice as an eye witness, had been rejected by the jury, nevertheless under the instructions of the court a verdict of guilty would have been both permissible and proper.

Certainly the charge requested by defendant as to the necessity of corroboration and as to the kind of corroboration required, in so far as the testimony of the prosecutrix is concerned, is not included in the instructions given by the court.

This is equally true as to the charge requested upon the necessity of proving the age of the prosecutrix beyond a reasonable doubt. It is true that the attention of the jury was called to the presumption of innocence and to the necessity of proving defendant's guilt beyond a reasonable doubt. But a reasonable doubt is defined as that state of mind in which a jury (or juror) finds itself (or himself) when after all the evidence is in, the jury (or juror) does not arrive at a conclusion either as to the guilt or as to the innocence of the defendant. Apparently a reasonable doubt could arise only in the event of a disagreement or else the inability on the part of a juror to make up his mind as to the guilt or innocence of the accused. But be this as it may, for aught that appears from the instructions given, a bare preponderance of the testimony either upon the question of age or upon the general issue would suffice to warrant and to sustain a verdict of guilty.

A more serious objection to the instructions is that de-

fendant's side of the case is not presented at all. The evidence for the prosecution is not only summed up but is presented from beginning to end in the form of a vigorous argument from the standpoint of the prosecutor rather than that of an unprejudiced and impartial presiding judge. The only reference made to the testimony for the defense is an admission as to the right of the defendant to testify in connection with the warning that he is not a disinterested witness. The fact that his testimony, together with that of at least two other witnesses, if believed by the jury would suffice to establish an alibi is utterly ignored.

There is, of course, no objection to the statement that the testimony of the defendant is to be treated in the same manner as that of any other witness in the case, taking into consideration his natural interest in the result of the trial. The manner in which the testimony of defendant is disposed of is mentioned merely by way of contrast to the fashion in which the testimony of Hernández is presented to the consideration of the jury, notwithstanding his obvious interest in avoiding any further proceeding on the part of the government in his own case.

The question of complicity, as already pointed out, is hinged upon the proposition that if there be an interval of time between two crimes, then the perpetrator of the second offense can not be deemed an accomplice as to the first. Obviously this theory, if carried to its logical conclusion, would exclude the possibility of either of two joint principals being considered an accomplice in every case of rape wherein the crime may have been actually consummated by each of such principals.

The charge as a whole is not the charge contemplated by section 233 of the Code of Criminal Procedure, the language of which is that the judge "will sum up the case to the jury, . . . pointing out wherein the main question and principal issues lie, stating what evidence has been given to sup-

port them, with such remarks as he thinks necessary for their direction, and giving them his opinion solely in matters of law arising upon that evidence.''

Defendant was entitled to have the jury instructed in substance at least along the lines indicated in the special instructions requested by him and numbered 1 to 7, *supra;* and we are unable to concur in the view that the subject matter of such special instructions was adequately covered by the general charge.

In view of the conclusions already reached, we do not deem it necessary to determine other questions of minor importance raised by appellant but not seriously discussed in the briefs. The errors, if any, may be readily avoided upon a new trial.

The judgment appealed from must be reversed and the case remanded for further proceedings not inconsistent herewith.

Mr. Chief Justice Del Toro dissented.

### CONCURRING OPINION OF MR. JUSTICE ALDREY.

I agree with the reversal of the judgment and the ordering of a new trial, because as it does not appear from the general instructions given by the court to the jury that any instruction was given that the testimony of the victim required corroboration in respect to the commission of the crime of rape with which the defendant is charged, the lower court erred, as alleged by the appellant under No. 6 of the assignment of errors submitted, in refusing to give to the jury the fourth instruction requested by the defense which reads thus: ''That the testimony of the victim must be corroborated in its essential facts in order to connect the defendant with the crime charged, the testimony of the physician on the fact of the ravishment not being a sufficient corroboration.''

I am authorized by Mr. Justice Franco Soto to state that he concurs in this opinion.

DISSENTING OPINION OF MR. CHIEF JUSTICE DEL TORO.

I agree that the court's instructions to the jury were deficient and erroneous, but in my opinion the error committed was not prejudicial to the defendant. The evidence was so clear and complete that the jury could not have been influenced by any other factor. Hernández was not an accomplice. The testimony of the girl and his testimony would have been ample evidence. But an independent witness, José Pérez Arroyo, repeated to the jury the defendant's own statements, which were made in such a manner that it can be safely asserted that no jury would have failed to find a verdict of guilty on simply hearing them.